Filed 3/23/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re B.E. et al., Persons Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>      Plaintiff and Appellant,<br><br>           v.<br><br>  J.E. et al.,<br><br>      Defendants and Respondents;<br><br>  B.E. et al., Minors, etc.,<br><br>      Appellants. | G058062<br><br>(Super. Ct. Nos. 16DP0317A; 16DP0318A; 17DP0664A)<br><br>O P I N I O N |

        Appeal from a judgment of the Superior Court of Orange County, Jeremy D. Dolnick, Judge.  Affirmed.

        Leon J. Page, County Counsel, Karen L. Christensen and Aurelio Torre, Deputy County Counsel, for Plaintiff and Appellant.

Daniel G. Rooney, under appointment by the Court of Appeal, for Defendant and Respondent J.E.

Baron Legal and Brian W. Baron for Defendant and Respondent Ja.E.

Leslie A. Barry, under appointment by the Court of Appeal, for Appellants and Minors.

\*          \*          \*

Welfare and Institutions Code section 361.5, subdivision (b)(13), allows a court to bypass reunification services to parents if they have "a history of extensive, abusive, and chronic use of drugs or alcohol and [have] resisted prior court-ordered treatment for this problem during a three-year period immediately prior to the filing of the petition . . . ."[1] This appeal concerns the meaning of the word "resist." The parents in this case indisputably have the sort of history that satisfies the first condition of subdivision (b)(13): They have a long history of drug use and relapses, including two prior dependency cases in which they underwent treatment, successfully reunified, but subsequently relapsed. They contend, and the court found, however, that they have not resisted a court-ordered treatment program. They simply relapsed. Orange County Social Services Agency (SSA) and the children appealed, contending that the parents' extensive history of relapses irrefutably demonstrates so-called passive resistance.

We are compelled to break with the line of cases that have interpreted subdivision (b)(13) as encompassing passive resistance, where passive resistance simply means relapse. The bypass provision was intended for parents who refuse to participate meaningfully in a court-ordered drug treatment program, not parents who slip up on their road to recovery. A line of cases beginning with *Randi R. v. Superior Court* (1998) 64 Cal.App.4th 67 (*Randi R.*) have resulted in a state of the law wherein a parent can be

---

[1] All statutory references are to the Welfare and Institutions Code. All subdivision references are to subdivisions of section 361.5, unless otherwise stated.

2

denied reunification services after one significant relapse, even if services have proven beneficial in the past. That is not what the statute means by "resisted . . . treatment." (Subd. (b)(13). There was no evidence that the parents actively resisted treatment here, and thus the court correctly offered them reunification services.

FACTS

This proceeding concerns three children, ages seven, four, and two.[2] Both mother and father have an extensive history of drug abuse, treatments, and relapses, and this is not the first dependency proceeding precipitated by their drug use.

The first was in April 2013. The eldest child was taken into protective custody when the parents were arrested for possession of heroin and methamphetamine. The child was declared a dependent of the court. The parents went through substance abuse treatment and were able to maintain sobriety over a period of three years. They reunified with the child in April 2015.

In March 2016, the eldest and middle child were taken into protective custody (the youngest having not yet been born) when father was found under the influence of illicit drugs and with uncapped needles in the home. Father admitted to police that he had recently completed a 30-day substance abuse program to "get off scripts" but that he had once again "slipped back into scripts." That same day, mother was found unresponsive in her vehicle due to a possible overdose. She was briefly hospitalized. The parents were again given reunification services, including substance abuse treatment, and maintained approximately two years of sobriety. They reunified with the children (including the now-born youngest child) in January 2018.

---

[2] Because the children have unique, identifiable names that share common initials, we will simply refer to them by their age or birth order (e.g., the seven-year old, or the eldest child).

3

Unfortunately, in 2018 the parents relapsed again. In March 2018, father relapsed for a few days on cocaine. Mother also briefly relapsed. Shortly afterward, in April 2018, both mother and father voluntarily enrolled in a residential drug treatment program (SSA was not involved at this point). Between April 2018 and August 2018, the parents left the children with family friends pursuant to a safety plan the parents had developed in the event they were to relapse. Although both parents successfully completed the program, father relapsed with heroin or cocaine a week after completing the program. Mother relapsed at roughly the same time.

On September 7, 2018, a hypodermic needle was found under the sofa in the family home, wrapped in a blanket. The needle was found by a company who moved the sofa in the parents living room to make way for a temporary hospital bed to help father recover from a staph infection. The company reported the needle to SSA. Both parents stated the needle was "old."

The needle prompted an investigation by SSA. Upon inspecting the home, SSA had no concerns, and the house appeared clean, well-organized, adequately furnished, and stocked with ample food. Given the parents' past history and recent relapses, however, on September 15, 2018, SSA filed a petition to take the children into protective custody.

The next day, father was found nonresponsive due to an overdose of painkillers. He was taken to the hospital. At trial father stated the overdose was due to his staph infection and his use of the pain medications he had been prescribed. Father contends he has been sober since August 2018.

After the children were removed, Mother relapsed on cocaine and heroin. On October 4, 2018, mother entered a four-day detoxification program, then reentered the program for an additional five days. Mother contends she has been sober since that time.

Both mother and father consistently drug tested over the protracted course of the jurisdictional/dispositional hearing, which did not finish up until late July 2019, ten

4

months after the children were removed.  Seven of the tests were ambiguous, however, because both parents were prescribed Adderall, which is an amphetamine salt.  The lab explained that this result could be caused by Adderall.  Aside from the ambiguous results, there were 12 tests that indicated drug use.  Mother tested positive for cocaine and heroin in September 2018 (which predates her claimed sobriety date).  Both Mother and Father tested positive for methamphetamine in December 2018 in amounts that could not be accounted for by their Adderall prescription.  Mother tested positive for cocaine in January 2019.  In April 2019, both parents took a hair follicle drug test through Quest Diagnostics which came back negative for amphetamines, cocaine, marijuana, opiates, and phencyclidine.  However, none of the parties called an expert to explain the significance of that test.

The parents were also on a number of prescription medications that consistently turned up in the test results.  Mother was prescribed Adderall (amphetamine salts) for attention deficit disorder.  She was prescribed Wellbutrin (anti-depressant), Xanax (anti-anxiety), and Suboxone (to manage cravings for opiates). Father had prescriptions for Suboxone, Adderall, Zolazepam (for sleeping), Xanax, and an inhaler.

Throughout the course of the underlying proceeding, both parents participated in all of the services recommended by the social worker.  Mother participated in therapy, a drug treatment program, narcotics anonymous meetings, a parenting class, and met with a sponsor.  Father engaged in the same services.  Both parents expressed a willingness to participate in whatever other services the social worker recommended.

At the conclusion of the protracted hearing, the court found the allegations of the petition to be true, but denied SSA's request to bypass reunification services.  Regarding the subdivision (b)(13) bypass, the court found, "First, in this case regarding active resistance, there is nothing present here that the parents are refusing to participate.  Regarding passive resistance, while the parents have considerable problems, the court does not find that the issues that these parents are presently pervasive or resistant . . . , or

5

that offering services . . . have gotten to the point of becoming fruitless." "What struck this court mostly is when the parents did relapse, they instituted their safety plan, and they did what they were instructed to do. They placed their children with the caretakers, they got into rehab." That said, the court made some adverse credibility findings against father and concluded with a stern warning for the parents: "I'm not going to allow these children to wallow in dependency court until these parents figure out their issues. If you don't figure it out quickly, this is going to be a very short-lived reunification plan." SSA and minor's counsel appealed.

## DISCUSSION

*Background Principles*

As a general rule, when a dependency petition is sustained and the children are detained, the parents are entitled to reunification services. (§ 361.5, subd. (a).) "'The paramount goal in the initial phase of dependency proceedings is family reunification.'" (*In re T.G.* (2010) 188 Cal.App.4th 687, 696.)

However, the Legislature has enumerated 17 exceptions to that rule where reunification services need not be provided. (Subd. (b).) Those exceptions generally describe situations in which it would be dangerous to return the child to the parents, such as repeated physical or sexual abuse (subd. (b)(3)), a sibling has been killed by parental neglect (subd. (b)(4)), severe physical or sexual abuse (subds. (b)(5), (6)), commission of a violent felony (subd. (b)(12)), abduction and refusal to return the child (subd. (b)(15)), registration as a sex offender (subd. (b)(16)), and sexual exploitation of the child (subd. (b)(17)).

Other exceptions apply when it would be, as some courts have put it, "'fruitless'" to offer reunification services. (*Karen S. v. Superior Court* (1999) 69 Cal.App.4th 1006, 1010 (*Karen S.*).) Those exceptions include the whereabouts of the parent are unknown (subd. (b)(1)), the parent is suffering from a mental disability that renders him or her incapable of utilizing reunification services (subd. (b)(2)), reunification services or parental rights have previously been terminated and the parent has not made a reasonable effort to treat the underlying problems that led to the termination (subd. (b)(10), (b)(11)), and when the parent declines services on the ground that he or she is not interested in reunifying with the child (subd. (b)(14)). In most of these cases, the court "shall not" offer reunification services unless the court finds, by clear and convincing evidence, that reunification is in the best interest of the child. (Subd. (c)(2).)

The bypass provision at issue here, subdivision (b)(13), falls into the bucket of fruitless scenarios. It applies where "the parent or guardian of the child has a history of extensive, abusive, and chronic use of drugs or alcohol and has resisted prior court-ordered treatment for this problem during a three-year period immediately prior to the filing of the petition that brought that child to the court's attention, or has failed or refused to comply with a program of drug or alcohol treatment described in the case plan required by Section 358.1 on at least two prior occasions, even though the programs identified were available and accessible." For this provision to apply, two conditions must be satisfied. The first condition is that the parent has an extensive history of drug or alcohol abuse. The second condition may be satisfied in either of two ways. Either the parent must have "resisted" a prior court-ordered treatment, one time, within the previous three years. Or the parent must have failed or refused to comply with a drug treatment program described in a case plan, two times, at any time in the past.[3]

---

[3] Implicit in this provision is a third condition: the current dependency proceeding is somehow related to drug abuse. It would make no sense to apply this

7

The issue in this case concerns the meaning of the word "resisted." The court found, and the parties do not dispute, that both parents have the sort of extensive history of drug abuse that satisfies the first condition of subdivision (b)(13). As to the second condition, SSA argued the resistance prong applied, not the compliance prong.

On appeal, SSA and minors' counsel contend the evidence below compelled a finding that the parents have resisted a court-ordered drug treatment program. They contend the parents' repeated relapses amount to what has come to be known as passive resistance. Because, as we foreshadowed in the introduction, we conclude passive resistance does not satisfy subdivision (b)(13), we begin by examining the origin and development of the passive resistance interpretation.

*Development of the Passive Resistance Interpretation*

The first case to introduce the concept of passive resistance (though not the term itself) is *Randi R.*, *supra*, 64 Cal.App.4th 67, an opinion out of this court authored by Justice Sills. There, the mother had been denied reunification services under former subdivision (10), which applied where the parent had previously failed to reunify with another child, as well as former subdivision (12), which is the former version of what is now subdivision (b)(13), the resistance provision at issue here. The *Randi R.* court affirmed the denial of services on the basis of former subdivision (10). It then stated, "We are not required to determine whether the findings under subsection (12) are correct because we uphold the court's determination that subsection (10) applies in this case." Nevertheless, because the issue was "likely to recur," the court decided to "briefly address the merits." (*Randi R.*, at p. 72.)

---

provision in a dependency proceeding where the parents no longer had a drug abuse problem.

8

The mother had previously completed two drug-treatment programs and relapsed within one year on both occasions. The court concluded, "Thus, while she has technically completed rehabilitation programs, her failure to maintain any kind of long-term sobriety must be considered resistance to treatment." (*Randi R.*, *supra*, 64 Cal.App.4th at p. 73.) The court's only justification for this interpretation was a *reductio ad absurdum* argument: "acceptance of [the mother's] definition of the term 'resist' would narrow the statute to the point of absurdity: A parent could repeatedly go through the motions of rehabilitation just long enough to regain custody of his or her child only to immediately revert to substance abuse and avoid the denial of services. We are convinced the Legislature did not intend to place such a limit on the juvenile court's discretion." (*Ibid*.)

The cases that followed *Randi R.* largely accepted its holding without significant analysis. The next case in this line is *Laura B. v. Superior Court* (1998) 68 Cal.App.4th 776 (*Laura B.*), which accepted the *Randi R.* court's premise that resistance can be "in the form of resumption of regular drug use after a period of sobriety." (*Laura B.*, at p. 780.) Perhaps recognizing the potentially harsh results that could follow, *Laura B.* qualified the rule, noting that a person who relapsed but "immediately resumed treatment" would "not necessarily prove resistance." There, the mother "did not just fall off the wagon on one or two occasions. She . . . returned to consistent, habitual, semiweekly and then biweekly substance abuse." (*Id.* at p. 780.) In that case, the mother had previously reunified with a child and successfully completed a drug treatment program. (*Id.* at p. 778.) The opinion does not say the amount of time that passed between the successful treatment and the resumption of drug abuse.

*In re Levi U.* (2000) 78 Cal.App.4th 191 (*Levi U.*) took the passive resistance interpretation one step further. Citing *Randi R.* and *Laura B.*, it held that a parent could be deemed to resist simply by failing to volunteer for a drug treatment program. (*Levi U.,* at pp. 199-201.) In other words, a parent could *resist* treatment even

9

though he or she had never attempted treatment, and never been ordered to treatment. Although *In re Levi U.* was never overruled directly, it appears to have been implicitly superseded by the 2003 amendment to subdivision (b)(13), which added the requirement that the treatment be court-ordered. Prior to that amendment, resistance to even a voluntary drug treatment program qualified. Voluntary drug treatment no longer qualifies, and thus the failure to volunteer for treatment is irrelevant under the current version of subdivision (b)(13).

The first case to introduce the active/passive resistance distinction was *Karen S.*, *supra*, 69 Cal.App.4th at page 1008. There, despite having voluntarily sought out treatment programs, the father "never had a significant period free of substance abuse . . . ." (*Id.* at p. 1009.) The court concluded the father had resisted treatment "by failing to benefit from treatment for his chronic use of illicit drugs and alcohol." (*Id.* at p. 1009.) The court explained, "The common definition of 'resist' is either 'to withstand the force or effect of' or 'to exert oneself to counteract or defeat.' (Webster's New Internat. Dict. (3d ed. 1981) p. 1932.) The definition encompasses both active and passive behavior. Thus, a parent can actively resist treatment for drug or alcohol abuse by refusing to attend a program or by declining to participate once there. The parent also can passively resist by participating in treatment but nonetheless continuing to abuse drugs or alcohol, thus demonstrating an inability to use the skills and behaviors taught in the program to maintain a sober life. In either case, a parent has demonstrated a resistance to eliminating the chronic use of drugs or alcohol which led to the need for juvenile court intervention to protect the parent's child. In other words, the parent has demonstrated that reunification services would be a fruitless attempt to protect the child because the parent's past failure to benefit from treatment indicates that future treatment also would fail to change the parent's destructive behavior." (*Id.* at p. 1010.)

The logical conclusion of this line of cases came in *In re William B.* (2008) 163 Cal.App.4th 1220, another opinion out of this court authored by Justice Sills. There, the father relapsed over a period of three months (*id*. at p. 1230) following closure of his children's dependency case, and we affirmed a trial court's denial of reunification services, finding the father had resisted drug treatment (*id.* at p. 1231). The result in *William B.* is syllogistically compelled by the foregoing cases. Under the *Randi R.* line of cases, resistance equals relapse. Under subdivision (b)(13), if a parent resists a court-ordered treatment program one time, the court is required to bypass services. Therefore, if a parent relapses one time, the court must bypass services.[4] And that is exactly what *William B.* held.

*Analysis*

We approach this issue by looking first to the language of the statute itself. (*John v. Superior Court* (2016) 63 Cal.4th 91, 95 ["'We consider first the words of a statute, as the most reliable indicator of legislative intent'"].) Conspicuously absent from subdivision (b)(13) is any language that clearly indicates a court may bypass reunification services to an addict who successfully completed a drug treatment program but subsequently relapsed. Had the Legislature meant that, it would have been very easy to express that concept in clear terms, as we just did. It did not.

Moreover, had the Legislature intended to *implicitly* bypass services for a mere relapse, there would have been no need to include the word "resisted" at all. It could have simply applied a bypass where the parent was ordered to treatment in the past three years and subsequently became the subject of a new case involving drug use. The word "resisted" is surplusage if the Legislature meant to apply a bypass to simple relapse. Thus, for "resisted" to mean anything at all in this context, it must mean something more

---

[4]     In syllogistic form:  A = B; If A, then C; therefore, if B then C.

11

than relapse. We conclude that what the Legislature meant by "resisted" is active resistance, not passive resistance.

We find support for our interpretation in the surrounding bypass provisions of subdivision (b). As set forth at the outset of the discussion, the bucket of fruitless scenarios all involve situations where it is quite obviously fruitless to offer services, such as where the parents cannot be found, suffer from an impairing mental illness, or simply do not want to reunify. The *Randi R.* line of cases, however, stand for the proposition that offering services would be fruitless just because a parent relapsed *one time*—a proposition that is not at all obvious; to the contrary, it is simply wrong in light of what we know today about addiction. As SSA acknowledged both at oral argument and in supplemental briefing, relapse is a normal part of recovery. In other words, a relapsed parent is far from hopeless. It is decidedly *not* fruitless to offer services to a parent who genuinely made an effort to achieve sobriety but slipped up on the road to recovery. On the other hand, where a parent has recently actively resisted a court-ordered drug treatment program—i.e., demonstrated an unwillingness to commit to sobriety—it becomes more apparent that trying the same approach so soon is unlikely to work. Courts cannot force a parent to choose sobriety. For this reason, our interpretation renders subdivision (b)(13) consistent with the other bypass provisions: a true case of futility.

Other bypass provisions that support our interpretation are subdivisions (b)(10) and (b)(11), which apply where the parent has previously had reunification services or parental rights terminated, and "has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling of that child from the parent." The focus is on a parent's demonstrated unwillingness to change. The legislative calculation is not simply that the parent did it before and so is likely to do it again. Our interpretation is consistent with that approach: resistance amounts to a demonstrated unwillingness to change.

12

*Counterarguments*

How, then, have courts arrived at the conclusion that the Legislature intended passive resistance? We glean two justifications in the caselaw described above. The first is the dictionary approach from *Karen S.*, and the second is the *reductio ad absurdum* argument from *Randi R.* We address each in turn.

With regard to the dictionary approach, we acknowledge that, in general, resistance can have both of those meanings—active and passive. The question here, however, is not what resistance means in general, but how the Legislature used it in this particular context. (*People v. Scott* (2009) 45 Cal.4th 743, 757 ["In construing a statute, we consider the words in context and interpret them in a manner that effectuates the intent of the Legislature"].) And in this context, the passive definition of resistance does not fit the common usage of that term. When a person goes through drug treatment successfully, but then relapses, it is not customary to describe that person as having resisted the treatment. Instead, one might describe the treatment as having failed, or, more likely, simply say the person relapsed. If a person is described as resisting drug treatment, that conjures to mind a person who either is unwilling to attend at all or unwilling to engage fully while in treatment. Drug treatment is not like an antibiotic. If an antibiotic does not cure a particular disease, the disease can be said to be passively resistant to the antibiotic. Managing addiction, on the other hand, is a process that inherently requires the addict's active participation. In that context, resistance means failing to engage meaningfully in the drug treatment program; i.e., active resistance.

With regard to the *reductio ad absurdum* argument, the *Randi R.* court argued, essentially, that unless we treat every significant relapse as resistance, parents will be free to simply "go through the motions" of treatment with the aim of achieving reunification and then immediately resuming a drug habit. We are not persuaded. *Randi R.*'s hypothetical represents, at best, an outlier. We doubt that addicts who have no genuine intention of achieving long-term sobriety can turn their addiction off and on like

13

a light switch for one to two years while a dependency proceeding plays out. And we doubt that it is easy to feign a genuine commitment to sobriety. The amount of duplicity that would be required to fool the court, the social worker, the director of the drug treatment program, the therapist, and everyone else involved is beyond the capabilities of most people. Such an outlier should not drive the interpretation of a statute. And in those cases where a parent does pull that off, that is a form of active resistance that would warrant bypassing reunification services under subdivision (b)(13). But to categorically deprive relapsed parents of the very services they need out of a fear that the court may occasionally be deceived is not a sound interpretation.

In addition to the arguments offered in the caselaw, SSA and minors' counsel have advanced the following argument in favor of the passive resistance interpretation: That Legislative amendments since *Randi R.* have implicitly ratified that interpretation. (See *Maricela C. v. Superior Court* (1998) 66 Cal.App.4th 1138, 1145 ["It is a well-established principle of statutory construction that when the legislature amends a statute without altering portions of the provision that have previously been judicially construed, the Legislature is presumed to have been aware of and to have acquiesced in the previous judicial construction'"].) Subdivision (b)(13) has been amended one time since the *Randi R.* decision, an amendment that added the requirement that the resisted treatment be court ordered, as opposed to voluntary.[5] (Stats. 2002, ch. 918, § 7.)

We are not persuaded this single amendment, which has little or nothing to do with the *Randi R.* line of cases, implies legislative approval. As other courts have acknowledged, "legislative inaction is a thin reed from which to divine the intent of the Legislature." (*Tomlinson v. Qualcomm, Inc.* (2002) 97 Cal.App.4th 934, 942; see *San Diego County Employees Retirement Assn. v. County of San Diego* (2007) 151

---

[5] Minors' counsel notes that section 361.5 more broadly has been amended 29 times since *Randi R.* But we do not consider amendments outside of subdivision (b)(13) to be particularly relevant.

14

Cal.App.4th 1163, 1184 ["it is well established that legislative inaction alone does not necessarily imply legislative approval, and at most provides only a 'weak inference of acquiescence'"].) As a practical matter, we can imagine many reasons why the Legislature might not have spent its resources and political capital to legislate against the passive resistance interpretation. We are not aware of any public outcry over the *Randi R.* line of decisions that might have caught the Legislature's attention. And the notion that the Legislature undertakes a complete appraisal of the entire body of caselaw every time it makes even a minor amendment to a statute is simply fanciful. There may be some particular contexts where legislative inaction gives rise to a more forceful inference, but here, with just a single amendment, and a relatively obscure line of cases, the argument is at best a weak one that is easily outweighed by the strong textual arguments countering it.

The final counterargument goes mostly unspoken, but it is perhaps the most influential: The need to address the parent who repeatedly relapses and seems genuinely hopeless. Why put the children through another six or 12 months of limbo when this parent has already failed multiple times and is likely to do so again? This is a genuine concern, and we recognize that the *Randi R.* line of cases, as well as the position of SSA and minors' counsel here, are well intended. In the face of an addict's repeated failures, it is easy to conclude that the children are better off with other caretakers, and the passive resistance interpretation may seem an attractive shortcut to a better outcome for the children.

The fundamental problem with that approach, however, is that subdivision (b)(13) is not limited to those worst case scenarios. Subdivision (b)(13) is structured so that only *one* instance of resistance to a court-ordered treatment is required to bypass services. As we saw in *In re William B., supra,* 163 Cal.App.4th 1220, if resistance means relapse, then only one relapse is required to bypass services, a conclusion we cannot agree with for the reasons discussed above. It is difficult to conceive a rule that

15

would target repeat offenders, but not a single relapse.  Could we craft a nuanced definition of passive resistance that required some number of relapses—how many, before resistance was established?  Or could we charge courts with attempting to prognosticate the future—will the parent successfully achieve sobriety, or not, and refusing services to those parents it predicts will not?

Aside from the practical difficulties inherent in such approaches, the heart of the problem is that crafting those sorts of rules is the purview of the Legislature, not the Judiciary.  This is a hard problem, and the Legislature has at its disposal the tools to tackle it:  broader fact-finding powers, extensive expert advice, and input from all interested stakeholders.  Courts, on the other hand, have a much smaller kit of institutional tools.  Moreover, as a matter of the separation of powers, it simply is not our place to craft a complex bypass procedure based on a single word in a statute.  Accordingly, if parents experiencing repeated relapses should be bypassed for reunification services, the Legislature must enact that rule, not the courts.  We encourage the Legislature to address the issue.

Here, both parents enjoyed lengthy periods of sobriety while participating in reunification services in prior cases.  And both parents have demonstrated a willingness to participate in further drug treatment programs.  Under these circumstances, the parents cannot be said to have resisted treatment.  Accordingly, the court did not err in offering them reunification services.

16

DISPOSITION

The judgment is affirmed.

IKOLA, J.

WE CONCUR:

ARONSON, ACTING P. J.

FYBEL, J.